**IRONS LLC**

## OPERATING AGREEMENT

THIS OPERATING AGREEMENT (hereinafter called "Operating Agreement", which term shall refer to all future amendments hereto) is made this 16th day of December, 2002, by and between the undersigned members, the addresses for the members being set forth by the attached **EXHIBIT A**.

WHEREAS, the parties hereto (hereinafter referred to as "members") have reached certain agreements regarding an association of themselves into a limited liability company; and

WHEREAS, it is the intention of the members to reduce these agreements into formal written form pursuant to the provisions of Chapter 12 Title 13.1 of the Virginia Annotated Code, also known as the Virginia Limited Liability Company Act (hereinafter called the "Act"), as amended hereafter from time to time, for the main purpose of forming a limited liability company to acquire, manage and hold investments, including, without limitation, ownership, beneficiary of annuities, life insurance policies, stocks, bonds, funds, accounts and other marketable securities or insurance related products and to purchase, lease or otherwise acquire, hold, develop, improve, mortgage, sell, exchange, let or in any manner encumber or dispose of property of every nature and description (real, personal, mixed and/or intangible) wherever situated.

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, the members of this limited liability company do hereby form a Virginia limited liability company, and in connection therewith agree as follows:

### SECTION 1

### NAME OF LIMITED LIABILITY COMPANY

The name of this Limited Liability Company is:  **"Irons LLC"**.

### SECTION 2

### PRINCIPAL OFFICE AND RESIDENT AGENT

The principal office in the District of Columbia of Irons LLC (hereinafter simply called "Company") shall be 3945 52nd Street, N.W., Washington, D.C. 20016, or such other location as the members may determine and specify by prior written notice to the other members and by proper filing as may be required with appropriate state agencies, including the Virginia State Corporation Commission ("SCC").

The address of the registered office of the Company in Virginia is 221 South Alfred Street, Alexandria, City of Alexandria, Virginia 22314.  The registered agent's name is Patience

1

EXHIBIT 2

Ann Alexander, Esquire, whose business address is identical with the registered office. The registered agent is a resident of Virginia, presently resides therein, and is a member of the Virginia State Bar. The members may determine from time to time any other individual or corporation as resident agent (as long as such individual or corporation qualifies under law to be a resident agent) and by proper filing as may be required with appropriate state agencies, including the Virginia SCC.

### SECTION 3

### BUSINESS OF LIMITED LIABILITY COMPANY

The current business purpose of the Company is to invest in, hold and operate marketable securities, bonds and investment real estate. In addition to the current business purpose, however, the Company shall be formed for the following business purposes, and shall have the following powers:

A.    To acquire, manage and hold investments, including, without limitation, ownership, or beneficiary of annuities, life insurance policies, stocks, bonds, funds, accounts and other marketable securities or insurance related products.

B.    To purchase, lease or otherwise acquire, hold, develop, improve, mortgage, sell, exchange, let or in any manner encumber or dispose of property of every nature and description (real, personal, mixed and/or intangible) wherever situated.

C.    To apply for, obtain, purchase, or otherwise acquire any licenses, permits, permissions, and the like, which might be used for any of the purposes of the Company; and to use, exercise and develop said licenses, permits and permissions and to sell and otherwise deal with the same.

D.    To loan, or advance money with or without security, without limit as to amount; and to borrow and raise money for any purposes of the Company, and in furtherance thereof, to execute any and all notes, drafts, and other instruments or any other evidences of indebtedness, and to secure the payment thereof, and interest thereon, by mortgage upon, or pledge or conveyance or assignment in trust of, the whole or any part of the property of the Company (real, personal, mixed and/or intangible), including contract rights, whether then owned or thereafter acquired.

E.    To open margin accounts, margin the Company's assets and/or make short sales with respect to any broker account.

F.    To carry on any of the businesses herein enumerated for itself, or for account of others, or through others for its own account, and to carry on any other business which may be deemed by it to be calculated, directly or indirectly, to effectuate or facilitate the transaction of

2

the hereinstated objects or businesses, or any of them, or any part thereof, or to enhance the value of its property, business or rights.

G.    To engage in any other lawful activity for which limited liability companies may be organized under the Act, as amended hereafter from time to time, and under any successor and/or replacement to said law.

## SECTION 4

## TERM

The term of Irons LLC begins upon recordation hereof with the Virginia SCC and ends on the first to happen of any event causing dissolution and/or termination under the Act, unless inconsistent with the provisions of this Operating Agreement lawfully providing to the contrary.

## SECTION 5

## CAPITAL

A.    An individual capital account shall be established and maintained for each member in accordance with Treasury Regulations §1.704-1(b)(2)(iv) and the following provisions: A member's capital account shall be credited with the member's capital contribution (herein defined), the amount of any liabilities assumed by the member, the member's share of profit and any item in the nature of income or gain specifically allocated to the member. A member's capital account shall be debited with the amount of money and the fair market value of any property distributed to the member, the amount of any liabilities of the member assumed by the Company, the member's distributive share of losses and any item in the nature of expenses or losses specially allocated to the member. If a member's interest in the Company is transferred pursuant to the terms of this Operating Agreement, the transferee shall succeed to the capital account of the transferor to the extent the capital account is attributable to the transferred interest.

B.    No member shall be required to make any capital contribution in addition to his or her initial capital contribution. The Founding Members, as defined in **Section 8.G,** may make additional capital contributions to the Company. Otherwise, the members may make additional capital contributions to the Company only if such additional capital contributions are made pro rata by all the members or all the members consent in writing to any non-pro rata contribution. The fair market value of any property other than cash or publicly traded securities to be contributed as an additional capital contribution shall be (a) agreed upon by the contributing member and a majority in interest of the other members before contribution, or (b) determined by a disinterested appraiser selected by the managing member.

3

## SECTION 6

## PROFITS AND LOSSES

A.     For purposes of this Operating Agreement and for federal and state income tax purposes, unless otherwise provided in this **Section 6**, any profits and gains of the Company shall be divided among the members; and net losses, deductions and credits shall be divided among them, pro rata in proportion to their percentage of Company interests as set forth in **EXHIBIT A**, as the same may be amended or revised from time to time; PROVIDED, HOWEVER, no member shall be liable for the losses of the Company in excess of the amount of his or her capital contribution to the Company capital, and no member shall be liable to any other member or the Company for any negative balances in his or her capital account after crediting his or her account with his or her proportionate share of Company profits and losses or by reason of any proportionate distribution of assets.

B.     No member, in his or her capacity as a member, shall be liable to third parties for any debts or other obligations of the Company for any amount in excess of his or her share of the capital of the Company.

C.     Notwithstanding the provisions of **Section 6.A.**, no member shall be allocated losses which will reduce the balance in his or her capital account below zero, except to the extent of such member's obligation, if any, under this Operating Agreement or under the laws of the Commonwealth of Virginia to contribute additional funds to the Company to pay obligations funding such losses. Any losses that cannot be allocated to a member because of the foregoing provision shall be allocated instead among the remaining members in accordance with their respective interests, but subject again to the aforegoing provisions.  Any residual losses shall be allocated to the members pro rata, in accordance with their proportionate share of Company interests as set forth on **EXHIBIT A**.

D.     Upon the transfer of all or any part of a Company interest (in accordance with the provisions of this Operating Agreement) at any time other than the end of a Company accounting year, the distributive share of the transferor (in respect of the Company interest so transferred), shall be allocated between the transferor and the transferee in the same ratio as the number of days in such Company accounting year before and after such transfer, except that the provisions of this sentence shall not be applicable to a gain or loss on the sale or other disposition of all, or substantially all, of the Company property.  Gain or loss on any such sale or transfer shall be allocated, as of the date of closing of the sale or transfer, to the members according to their Company interests on the date the gain or loss is realized.

E.     Except to the extent otherwise required to maintain capital accounts in accordance with Section 1.704-1(b)(2)(iv) of the Income Tax Regulations, including the effects of Section 704(c) of the Internal Revenue Code, the term "profits" and "losses" as used in this Operating Agreement shall mean taxable income and losses as determined in accordance with the accounting methods followed by the Company for federal income tax purposes.

4

F.    No member shall be liable to fund any deficit in the member's capital account at any time.   Notwithstanding any other provision in this Operating Agreement, if a member unexpectedly receives an adjustment, allocation, or distribution described in Treasury Regulations §1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6), and the unexpected adjustment, allocation, or distribution results in a deficit balance in the capital account of the member, the member will be allocated items of income and gain in an amount and manner sufficient to eliminate the deficit balance or the increase in the deficit balance as quickly as possible.   It is intended that this paragraph will meet the requirements of a "qualified income offset" as defined in Treasury Regulations §1.704-1(b)(2)(ii)(d), and this paragraph is to be interpreted and applied consistent with that intention.

## SECTION 7

## DISTRIBUTION OF NET CASH FLOW

A.    In each fiscal year, the managing member shall distribute so much of the "Net Cash Flow" as the managing member, in the managing member's reasonable discretion, deems available for distribution to members; but such distributions may be restricted or suspended in circumstances that the managing member believes to be in the best interests of the Company, and shall be determined in accordance with **Section 8** of this Operating Agreement; and such distributions shall not be unreasonable withheld.   The managing member is bound by this fiduciary duty to act in the best interests of the Company.   Further, the managing member shall distribute so much of the Net Cash Flow as is necessary to provide to the members sufficient funds to pay any income tax liability imposed as a result of being a member of this Company.   The Company's accountant shall make this determination on an annual basis.

All distributions are first subject to payment of Company expenses and outstanding debts, and are further subject to maintenance by the managing member of reasonable allowances for reserves, contingencies and anticipated obligations.   The Net Cash Flow of the Company in each calendar year (or fraction thereof) shall be distributed to each member in proportion to each member's Company interest as set forth in **EXHIBIT A**, as such Company interests and/or **EXHIBIT A** may change from time to time hereafter.

B.    For purposes of this Operating Agreement, "Net Cash Flow" shall mean:

(1)    Taxable income of the Company for federal income tax purposes increased by (a) the amount of depreciation deductions and other non-cash charges and deductions taken in computing such taxable income, and (b) any non-taxable income or receipts of the Company; and reduced by (aa) payments upon the principal of any mortgages upon Company property or of any other Company loans or obligations, (bb) expenditures for the acquisition of Company property, (cc) expenditures for capital improvements or replacements, (dd) such reserves for repairs, sufficient working capital and future development expenses as the managing member shall deem to be reasonably necessary in the efficient conduct of the Company business, and (ee) any other

5

cash expenditures which have not been deducted in determining the taxable income of the Company; plus

(2)    Any other funds (including amounts previously set aside as reserves, where and to the extent they are no longer reasonably necessary in the efficient conduct of the Company business) deemed available for distribution and designated as Net Cash Flow by the managing member; plus

(3)    To the extent not included in taxable income under **paragraph 7.B.(1)**, the net proceeds from the sale or other disposition of all or substantially all of the property of the Company; plus

(4)    In the event of the refinancing (which term "refinancing" is hereby defined for all purposes of this Operating Agreement to include the recasting, modifying, increasing or extending) of any mortgage on all or any part of the property of the Company, such proceeds therefrom as are not used to finance capital improvements or replacements, if any, remaining after payment of or provisions for payment of (to the extent the managing member may determine such payment to be appropriate) liabilities to creditors of the Company (including the repaying of any loans made by the members to the Company).

C.    In determining the amount of Net Cash Flow, any negative in any category described above shall be deducted from the positive balances in the other such categories.

## SECTION 8

## MANAGEMENT OF THE COMPANY'S BUSINESS

A.    **Edward S. Irons** shall be the initial managing member and shall conduct the day-to-day business affairs of the Company to the extent such affairs shall need to be managed.

B.    The managing member's powers shall include, but not be limited to, the following:

(1)    Entering into, making and performing contracts, agreements and other undertakings binding the Company that may be necessary, appropriate or advisable in furtherance of the purposes of the Company.

(2)    Opening and maintaining bank accounts, investment accounts and other arrangements, drawing checks and other orders for the payment of money, and designating individuals with authority to sign or give instructions with respect to those accounts and arrangements. Company funds shall not be commingled with funds from other sources and shall be used solely for the business of the Company.

(3)    Collecting funds due to the Company.

6

(4) Acquiring, utilizing for the Company's purposes, maintaining and disposing of any assets of the Company.

(5) To the extent that funds of the Company are available therefor, paying debts and obligations of the Company.

(6) Borrowing money or otherwise committing the credit of the Company for Company activities, and voluntarily prepaying or extending any such borrowings.

(7) Employing from time to time persons, firms or corporations for the operation and management of various aspects of the Company's business, including, without limitation, managing agents, contractors, subcontractors, architects, engineers, laborers, suppliers, appraisers, accountants and attorneys on such terms and for such compensation as the managing member shall determine.

(8) Making elections available to the Company under the Internal Revenue Code.

(9) Obtaining general liability, property and other insurance for the Company, as the managing member deems proper.

(10) Doing and performing all such things and executing, acknowledging and delivering any and all such instruments as may be in furtherance of the Company's purposes and necessary and appropriate to the conduct of its business.

C. Nothing herein contained shall be construed to constitute any member the agent of another member, except as expressly provided herein, or in any manner to limit the members in the carrying on of their own respective businesses or activities. Any of the members, or any agent, servant or employee of any of the members, may engage in and possess any interest in other businesses or ventures of every nature and description, independently or with other persons, whether or not, directly or indirectly, in competition with the business or purpose of the Company, and neither the Company nor any of the members shall have any rights, by virtue of this Operating Agreement or otherwise, in and to such independent ventures or the income or profits derived therefrom, or any rights, duties or obligations in respect thereof.

D. The members shall devote to the conduct of the Company business so much of their respective time as may be reasonably necessary for the efficient operation of the Company business.

E. The members may engage in or possess an interest in other business ventures (unconnected with the Company) of every nature and description, independently or with others, except to the extent prohibited or restricted by the Act.

7

F.      In each case where the Act, as hereafter amended from time to time, requires a unanimous vote of the members of the Company before a particular action may be taken by the Company, that unanimous affirmative member vote requirement shall be lowered to an affirmative vote of a majority of the members of the Company. This provision in the Articles of Organization is meant to reduce the unanimous voting requirement for (but not be limited to) each of the following organizational actions: articles of organization amendments, consolidation, merger, substantial sale of assets, liquidation and dissolution.

G.      For so long either **Edward S. Irons** or **Mary Lee Irons** (the "Founding Members") is a member and has not consented by majority otherwise in writing, **Edward S. Irons**, or if **Edward S. Irons** ceases to be a member, then, second, **Mary Lee Irons**, or such person or persons whom the Founding Members designate by majority, shall be the only managing member or members of the Company. If both Founding Members cease to be members, and have not designated a successor or successors, then the managing member or members shall be elected annually by majority vote of the then members.

H.      The managing member shall be entitled, but not required, to receive a reasonable salary for services rendered on behalf of the Company or in his or her capacity as managing member. The amount of such salary shall be determined by the managing member and consented to by the members, which consents shall not be unreasonably withheld. The Company shall reimburse any managing member for reasonable out-of-pocket expenses that were or are incurred by the managing member on behalf of the Company with respect to the start-up or operation of the Company, the on-going conduct of the Company's business, or the dissolution and winding up of the Company and its business.

I.      The Company shall indemnify each managing member, whether serving the Company or, at their request, any other entity, to the full extent permitted by the Act. The foregoing rights of indemnification shall not be exclusive of any other rights to which the managing member may be entitled. The managing member may take such action as is necessary to carry out these indemnification provisions and may adopt, approve and amend from time to time such resolutions or contracts implementing such provisions or such further indemnification arrangements as may be permitted by law.

J.      So long as the managing member acts in good faith with respect to the conduct of the business and affairs of the Company, the managing member shall not be liable or accountable to the Company or to any of the members, in damages or otherwise, for any error of judgment, for any mistake of fact or of law, or for any other act or thing that the managing member may do or refrain from doing in connection with the business and affairs of the Company, except for willful misconduct or gross negligence or breach of fiduciary duty, and further except for breaches of contractual obligations or agreements between the managing member and the Company.

8

## SECTION 9

## POWER OF ATTORNEY

A.    Each member does hereby irrevocably constitute and appoint the managing member serving in office from time to time as such member's true and lawful attorney, in his or her name, place and stead, to make, execute, consent to, swear to, acknowledge, record and file from time to time any and all of the following:

(1)    Any certificate or other instrument that may be required to be filed by the Company or the members under the laws of the Commonwealth of Virginia or under the applicable laws of any other jurisdiction in order to conduct business in any such jurisdiction, to the extent the managing member deems any such filing to be necessary or desirable.

(2)    Any amendment to the articles of organization adopted as provided in this Operating Agreement.

(3)    Any certificates or other instruments that may be required to effectuate the dissolution and termination of the Company pursuant to the provisions of this Operating Agreement.

B.    It is expressly understood, intended and agreed by each member for himself or herself, his or her successors and assigns, that the grant of the power of attorney to the managing member pursuant to **paragraph 9.A.** above is coupled with an interest, is irrevocable, and shall survive the death or legal incompetency of the member or such assignment of his or her Company interest.

C.    One of the ways that the aforementioned power of attorney may be exercised is by listing the names of the members and having the signature of the managing member, as attorney-in-fact, appear with the notation that the signatory is signing as attorney-in-fact of the listed members.

## SECTION 10

## TITLE TO PROPERTY

Legal title to all property of the Company (real, personal, mixed and/or intangible) shall be held, and where necessary registered, in the name of the Company.

## SECTION 11

## LIMITED LIABILITY

The liability of the members in their capacity as members shall be limited to the amount of the capital contributions specified in **EXHIBIT A**. No member shall, in his or her capacity as a member, have any further liability for any of the debts or be bound by any of the obligations of the Company.

## SECTION 12

## BANK ACCOUNTS

The funds of the Company shall be initially deposited in such bank account or other types of accounts as may be determined by the managing member from time to time, and the managing member shall arrange for the appropriate conduct of such accounts.

Notwithstanding the foregoing, the managing member may deposit funds of the Company in interest-bearing accounts in banks or savings and loans or in broker accounts or money market fund accounts, or may otherwise hold and/or invest funds of the Company as the managing member deems appropriate.

## SECTION 13

## REQUIRED RECORDS AND COMPANY BOOKS

A.    There shall be kept at the principal office of the Company just and true books of account, in which shall be entered fully and accurately each and every transaction of the Company. Each member shall have access thereto for purposes of inspection and copying during ordinary business hours, at the reasonable expense of the member requesting such inspection and/or copying. The books shall be kept on either the cash receipts and disbursements method or an accrual method and for such accounting year (calendar or fiscal) as the members may determine. For purposes of determining net profits and losses of the Company, Company accounting shall be carried out in the same manner as for federal income tax purposes. A statement (which need not be certified) shall be made as of the end of each accounting year by the accountant serving the Company, and each member shall be entitled to a copy of the report or a summary thereof. Any member shall further have the right to a private audit of the books and records of the Company, provided that such audit is made at the expense of the member desiring it and is made at reasonable times after due notice.

In addition to the aforegoing, the Company shall keep at its principal office, subject to inspection and copying as aforesaid, the following records:

(1)    A current list of the full name and last known home or business address of each member set forth in alphabetical order;

(2)    A copy of the Company's articles of organization, together with executed copies of all powers of attorney, if any, pursuant to which any articles of organization of the Company have been executed;

(3)    Copies of the Company's federal, state and local income tax returns and reports, if any, for the three (3) most recent years;

(4)    Copies of the then effective written Company Operating Agreement and of any financial statements of the Company for the three (3) most recent years;

(5)    Executed copies of all Company leases; and

(6)    The balance of the Company books.

B.    The members acknowledge that the Company will be treated as a "partnership" for federal and Virginia state tax purposes. All provisions of the Company's articles of organization and this Operating Agreement are to be construed so as to preserve that tax status. The managing member may make (and if made, may revoke) such elections under the Internal Revenue Code or any successor thereto which the managing member shall determine to be in the best interests of the Company. Each member shall, upon request, supply the information necessary to properly give effect to any election.

C.    **Edward S. Irons** is hereby designated as the "Tax Matters Partner" in accordance with Section 6231(a)(7) of the Internal Revenue Code, and, in connection therewith and in addition to all other powers given thereunto, shall have all other powers necessary or appropriate fully to perform such role. The Tax Matters Partner shall have the power to retain attorneys and accountants and the right to settle any audits only with the consent of a majority of the members.

## SECTION 14

## SALARIES, COMPENSATION AND CONTRACTUAL PROFITS

A.    If determined by the members in accordance with the provisions of **Section 8**, any member or person related (directly or indirectly) in any way to a member may receive compensation for services rendered to the Company, and any such member or related person shall likewise be entitled to receive a profit from any contract or agreement entered into with the Company as long as such profit has been disclosed to the satisfaction of the members.

B.    Any member individually, or any firm in which any member may be involved, may be a party to, or may be pecuniarily or otherwise interested in, any contracts or transactions

11

of the Company, and in the absence of fraud no contract or other transaction shall be thereafter affected or invalidated.

## SECTION 15

## VOLUNTARY TRANSFER OF COMPANY INTEREST;
## OPTION ON DEATH OF A MEMBER

A.      Except as provided in **paragraph 15.D**, no member (hereinafter referred to as the "Selling Member") shall sell, hypothecate, pledge, assign, or otherwise transfer with or without consideration (hereinafter collectively referred to as "Transfer") any part or all of their interest or rights in the Company (hereafter "Company Interest") without first notifying the Company and each of the remaining members of the Company in writing, sent certified mail, postage prepaid, return receipt requested, and complying with the other provisions of this Operating Agreement.

B.      Each member hereby covenants and agrees that he or she will not sell, assign, transfer, mortgage, pledge, encumber, hypothecate or otherwise dispose of all or any part of his or her Company Interest to any person, firm, corporation, trust or other entity without offering a right of first refusal to the Company. The Company shall have the right to accept the written third party offer at any time during the thirty (30) days following the date of which the written third party offer is delivered to the Company. The consent of the managing member shall be required to authorize the exercise of such right of first refusal by the Company. If the Company shall fail to accept the offer within the thirty (30) day period or waives its right of first refusal in a writing signed by the managing member prior to the expiration of the thirty (30) day period, such Company Interest may during the immediately following sixty (60) days be disposed of free of the restrictions imposed by this Operating Agreement; provided, however, that the purchase price for such Company Interest shall not be less and the terms of purchase for such interest shall not be more favorable than the purchase price and terms of purchase contained in the third party offer. Any Company Interest not so disposed of within the sixty (60) day period shall thereafter remain subject to the terms of this Operating Agreement. Notwithstanding the preceding sentences, no assignee of a Company Interest shall become a member of the Company except upon the consent of the managing member.

C.      Upon the death of a member, the remaining members shall have the right to purchase any part or all of the deceased member's Company Interest, pro rata, or non pro rata as the members may agree, for a period of ninety (90) days following the date of death of the deceased member at fair market value. If the remaining members fail to exercise their option with respect to any part of the deceased member's Company Interest within ninety (90) days of the deceased member's death or all remaining members waive their right to purchase in writing prior to the expiration of the ninety (90) day period, then such option shall terminate and such deceased member's Company Interest may be freely transferred. For purposes of this paragraph, the exercise price by the members shall be the fair market value as determined by the accountant regularly employed by the Company to prepare its federal income tax returns, or, if agreeable to the deceased member's personal representative or other successor-in-interest and the members

exercising their option by a qualified independent business appraiser acceptable to such parties in interest.

D.    Notwithstanding the foregoing, a member shall be free to transfer any Company Interest owned by the member to the trustee of a revocable trust for the member's benefit upon signature of such trustee to this Operating Agreement.   For all purposes of this Operating Agreement, any Company Interest transferred to a member's revocable trust shall be treated the same as a Company Interest held directly by the member.

## SECTION 16

## CERTAIN FURTHER EVENTS
## GIVING RIGHT TO PURCHASE OPTION

A.    A member shall automatically be deemed to have proposed the voluntary Transfer of his or her entire Company Interest and thereby give rise to the right to a purchase option of the remaining members, pro rata or non pro rata, as the members may agree upon the occurrence of any of the following events:

(1)    A member shall have filed against him or her any tax lien respecting all or substantially all of his or her property and such tax lien shall not be discharged, removed or bonded within sixty (60) days of the date on which it was filed; or

(2)    A member shall have a judgment filed against him or her or shall subject his or her Company Interest or any part thereof or interest therein, or shall have them subjected to a charging order or lien entered by any court of competent jurisdiction; or

(3)    A member shall file a voluntary petition in bankruptcy or shall have an involuntary petition in bankruptcy filed against him or her and the same is not dismissed or vacated within forty-five (45) days; or

(4)    A member's spouse shall have made a claim against a member for a portion of a member's Company Interest as being marital property subject to equitable distribution by statutory or common law.

Upon the occurrence of any event specified in this **Section 16**, the purchase price pursuant to a right to purchase under this **Section 16** shall be sixty percent (60%) of the fair market value (including discounts) of the member's percentage Company's Interest.

13

## SECTION 17

## INDEMNIFICATION

The members herein agree that, as among themselves, if any member shall be required to pay any Company debt, expense and/or liability of any nature because of his or her status as a member to an extent greater than his or her proportionate share therefor under the terms of this Operating Agreement, then the other members shall indemnify and hold such member harmless for, and shall reimburse to such member, the amount by which such debt, expense, or liability paid by such member exceeded his or her proportionate share thereof. The members agree that the indemnification and reimbursement hereunder shall be made by each based upon their respective ownership interest in the Company.

## SECTION 18

## ARTICLES OF ORGANIZATION

**Edward S. Irons** has prepared and filed Articles of Organization, pursuant to the laws of the Commonwealth of Virginia. The members ratify such filing on behalf of the Company.

## SECTION 19

## TERMINATION OF COMPANY

The term of this Company shall end with the first to happen of the following events:

A.    Any act causing dissolution and/or termination under the Act unless inconsistent with the provisions of this Operating Agreement lawfully providing to the contrary; or

B.    By unanimous written agreement of the members; or

C.    Upon the entry of a decree of judicial dissolution with respect to the Company.

Upon termination of the Company, the members shall promptly proceed to sell or otherwise liquidate the assets and property of the Company and to distribute the proceeds of sale and the assets of the Company in accordance with the Operating Agreement. If all members agree, all or certain of the assets of the Company may be distributed in kind.

Upon the dissolution of the Company, the members shall act as liquidating trustees and shall liquidate and reduce to cash the assets of the Company as promptly as is consistent with obtaining a fair value therefor and, unless otherwise required by the Act, shall apply and distribute the proceeds of liquidation, as well as any other Company assets in accordance herein.

## SECTION 20

## DISTRIBUTION IN DISSOLUTION

Upon termination, the members, or if there are no members, such other person designated as liquidating agent, shall proceed to liquidate the assets of the Company, or to distribute them in kind, as applicable, with such assets and proceeds of liquidation being applied and distributed in the following manner:

A.     To the payment of the expenses of liquidation and dissolution, then to the payment of secured debts and secured liabilities of the Company, then to the other debts and liabilities of the Company (including within this category of debts any loans owed by the Company to the members); then

B.     To the establishment of such reserves which the members or liquidating agent deems reasonably necessary for any contingent liabilities or obligations of the Company arising out of the business of the Company.  Such reserves unexpended shall ultimately be distributed in the manner hereinafter provided; then

C.     Any remaining amounts shall be distributed among all the members in proportion to their Company capital accounts as compared to total capital accounts of all members, and after proper credits, when all capital accounts are reduced to zero, or are equalized in the case of negative balances, then between the members in proportion to their Company Interests as per the attached **EXHIBIT A**, as it may be amended from time to time.  The Company capital accounts shall be appropriately adjusted to reflect the allocation of profit and loss pursuant to **Section 6** and distributions pursuant to **Section 7** before any distributions pursuant to this **Section 20** are made.

D.     If the distributions of such sales proceeds pursuant hereto are not sufficient to return a member's capital account, such member shall have no further recourse against the Company or any other member, except where deemed appropriate by the Company's accountant in the case of negative balances in capital accounts of members.

Upon completion of dissolution as herein set forth, all members shall receive a complete accounting of the liquidation process from the date of termination of the Company, and the members shall cause to be filed in required form a Certificate of Cancellation of the Company.

## SECTION 21

## BINDING EFFECT OF OPERATING AGREEMENT

This Operating Agreement shall be binding upon and inure to the benefit of the parties hereto as well as any future members and their respective heirs, executors, administrators, personal representatives, legatees, successors and/or assigns; and constitutes the entire agreement

15

between the parties hereto, and any prior or contemporaneous written or oral agreements or statements to the contrary notwithstanding.

## SECTION 22

## MISCELLANEOUS PROVISIONS

A.     Unless otherwise so provided in this Operating Agreement, no member shall be liable to any other member or to the Company by reason of his or her actions in connection with the Company, except in the case of actual fraud, gross negligence, dishonest conduct, or breach of the terms of this Operating Agreement.

B.     Except as provided herein, nothing herein contained shall be construed to constitute any member the agent of another member or to limit in any manner the members in the carrying on of their own respective business or activities.

C.     Any member may engage in and/or possess any interest in other business and real estate ventures of every nature and description, independently, or with others, including, but not limited to, the ownership, financing, leasing, operation, management, syndication, brokerage and development of real property; and neither the Company nor the members shall have profits derived therefrom.

D.     All notices provided for herein shall be in writing and shall be sent by certified mail, return receipt requested, and postage prepaid to the address of the member as shown in **EXHIBIT A**, unless notice of a change of address is given to the Company in writing.  Time periods shall commence on the date of mailing of a notice unless otherwise specifically provided.  Any notice which is required to be given within a stated period of time shall be considered timely if postmarked before midnight of the last day of such period.

E.     The invalidity or unenforceability of any particular provision of this Operating Agreement shall not affect the other provisions hereof, and this Operating Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

F.     This Operating Agreement may be amended by the unanimous vote of the members.

G.     Any member made a party to any action, suit or proceeding by reason of the fact that he or she is a member of the Company, unless the plaintiff in such proceeding is the Company, shall be indemnified by the Company against the reasonable expenses, including attorney's fees and costs, actually and necessarily incurred by him or her in connection with the defense of such action, suit or proceedings, or in connection with any appeal therein.

H.     At no time shall members have the right to receive other than cash in return for contributions to capital of the Company, and no member is entitled to receive any interest on his

16

or her contribution to Company capital. A member is not entitled to require any refund of capital contributions until termination of the Company, but the managing member may in the managing member's discretion, from Net Cash Flow, refund to the members all or any part of contributions prior to termination.

I.      None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditor of the Company.

J.      Any and all disputes under this Operating Agreement or involving any of its terms shall be settled by arbitration in the following manner:

A member and the Company shall each select an attorney and/or other individual to act in their behalf. Either party shall be required to select such individual within ten (10) days following written demand being made therefor by the other party. A default judgment may be entered against any party who fails to appoint such an individual. The persons so selected, after having given ample opportunity to both parties to present their disputes, shall within thirty (30) days of their selection settle any disputes between the parties. A default judgment may be entered against any party who fails to appear at an arbitration conference. If the two attorneys or individuals are unable to reach a conclusion to such dispute within such period of time, then they shall together select a third arbitrator within forty-five (45) days of the selection of the original two arbitrators, and the three arbitrators shall decide all disputes within sixty (60) days of the selection of the original two arbitrators. The decision of the arbitrators regarding issues subject to arbitration hereunder shall be final, and an order or decree of a court of competent jurisdiction may be rendered to enforce the award or decision as rendered. The arbitrators so selected shall determine all procedures to be used in gathering information and rendering a decision. The arbitrators shall assess the costs of arbitration. The parties to this Operating Agreement agree that this paragraph has been included to rapidly and inexpensively resolve any dispute between them and that this paragraph shall be grounds for dismissal of any court action commenced by any party with respect to a dispute arising out of the issue submitted to arbitration.

K.      The use of any gender herein shall be deemed to be or include the other genders and the use of the singular herein shall be deemed to be or include the plural (and vice versa), wherever the context requires.

L.      This Operating Agreement may be executed in a number of counterparts, each of which represents an exact duplicate of the other, and each of which shall be treated as one original of this Operating Agreement.

M.      This Operating Agreement is meant to create legal rights and duties between the parties hereto and those other persons herein upon which rights and obligations are specifically conferred and imposed and is not meant and shall not be construed to create any rights in third persons, including creditors, not parties hereto based on any legal theory including "reliance", "fraud", "third-party beneficiary" or related or similar concepts.

17

N.    The members hereto agree that the provisions of the Act, as amended from time to time, shall govern the Company, this Operating Agreement and the Articles of Organization. to the extent not inconsistent herewith.

**IN WITNESS WHEREOF,** the members have each executed this Operating Agreement as evidenced by their signatures appearing below and do hereby acknowledge this Operating Agreement as of the date first above written.

WITNESS:

_____    _____ (SEAL)
                                    Edward S. Irons

_____    _____ (SEAL)
                                    Mary Lee Irons

_____    _____ (SEAL)
                                    Edward S. Irons, Trustee of the Edward S.
                                    Irons Revocable Inter Vivos Trust dated
                                    July 3, 1992, as amended

_____    _____ (SEAL)
                                    Mary Lee Irons, Trustee of the Mary Lee
                                    Irons Revocable Inter Vivos Trust dated
                                    July 3, 1992, as amended

18

## EXHIBIT A

### Irons LLC
### Initial Contributions and
### Percentages of Company Interest

| Name | Initial Contribution | % of Company Interest |
|---|---|---|
| Edward S. Irons | | 0% |
| Edward S. Irons, Trustee | | 50% |
| of the Edward S. Irons Amended and Restated | | |
| Revocable Trust Agreement Dated | | |
| December 16, 2002 | | |
| 3945 52nd Street | | |
| Washington, D.C. 20016 | | |
| | | |
| Mary Lee Irons | | 0% |
| Mary Lee Irons, Trustee | | 50% |
| of the Mary Lee Irons Amended and Restated | | |
| Revocable Trust Agreement Dated | | |
| December 16, 2002 | | |
| | | |
| 3945 52nd Street | | |
| Washington, D.C. 20016 | | |
| | | |
| Total: | | 100% |